**E. S. TUBIN**

v.

**Meyer RABIN, a/k/a Meyer Raben, et al.**

**No. CA 3–2640–C.**

United States District Court,
N. D. Texas,
Dallas Division.

Sept. 26, 1974.

Lawrence E. Ackels, Weinberg, Sandoloski & McManus, Dallas, Tex., for plaintiff.

Mike Joplin, Strasburger, Price, Kelton, Martin & Unis, Dallas, Tex., for C. D. Wyche.

James A. Knox, Vial, Hamilton, Koch, Tubb, Knox & Stradley, Dallas, Tex., for the bank.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

This is a Uniform Commercial Code case arising out of diversity of citizenship which seeks to determine the party ultimately responsible and therefore liable for payment of a fraudulently endorsed cashier's check for $14,250.00.[1] On December 19, 1967, Meyer Rabin and some other men appeared at defendant Fair Park National Bank with this check. One of the men was represented to be Melvin E. Rueckhaus. The check was endorsed by Rabin for himself and Consumer's Investment Company, the check apparently having already been endorsed by C. D. Wyche. Mrs. Fern Harbison, assistant vice president of the bank, testified that she had the man identified as Reuckhaus again endorse the check. Mr. Rueckhaus is a New Mexico attorney who appeared at the trial of this case and testified emphatically, positively and categorically that he was not present at the bank on that date. It was definitely established in the trial of this case that the signature of C. D. Wyche was indeed forged. Defendant bank accepted the check and credited it to the account of defendant Consumer's Investment Company and Meyer Rabin's account 7–0311–6. Soon thereafter four relatively large checks totaling $12,000.00 were drawn against this account and the remaining $2250.-

---

1. Of the five named defendants, Fair Park National Bank appears to be the only solvent and approachable one. Meyer Rabin, against whom this Court issues a default judgment, was last seen in October, 1970, when he jumped bail bond and a warrant for his arrest was returned unexecuted. C.I.C. presumably has followed the example of its president, Rabin, into oblivion. And finally, Cowart is not the subject of this Court's judgment since it doesn't have jurisdiction over him.

00 [2] was disbursed as the result of subsequent withdrawals and the eventual closing of the account on February 15, 1968.

The whole existence of the $14,250.00 cashier's check interrelates with the purported attempts by the defendants to procure a $2,850,000.00 loan needed to fund the purchase of land and facilities for the development of the "Triple T Fun & Games Ranch".[3] The negotiations surrounding this loan occurred in November, 1967, when Max Triplett, a non-party to this suit, entered into an agreement with Charles Cowart, a party defendant, whereby Cowart promised to obtain the desired loan for Triplett. Cowart arranged for a tentative loan to be made by Consumer's Investment Company through its president, Meyer Rabin.

By commitment letter dated November 1, 1967, and telegram dated November 16, 1967, all conditions precedent to the loan arrangement, as required by defendant Meyer Rabin in behalf of C.I.C., were met with one exception—payment of the ½ of 1% "point" [4] fee for procuring the loan. This procurement fee of $14,250.00, requested by Rabin to be in the form of a cashier's check, presented a real problem for Max Triplett who apparently possessed no personal financing capacity whatsoever. In order to preserve the loan, Triplett turned to the plaintiff, Tubin, for the $14,250.00. Tubin reluctantly agreed but at the same time had Melvin Reuck-

haus, his attorney, effectuate the negotiation of the cashier's check by pre-conditioning its acceptance upon the full execution of the $2,850,000.00 loan by Rabin and C.I.C.

Reuckhaus purchased the cashier's check for Tubin from the First National Bank of Albuquerque. By issuing the cashier's check on December 15, 1967, First National acted as both drawer and drawee.[5] It designated Reuckhaus as the payee, since the check was made payable to his "order". The crucial aspect of this case came with Reuckhaus' special endorsement and the attempted negotiation of the check to C.I.C. and C. D. Wyche. In order to assure Tubin's protection against a loan hoax, Reuckhaus specially and restrictively endorsed the check as follows:

PAY TO THE ORDER—CONSUMERS INVESTMENT CO. and CHARLES D. WYCHE, SR., of 1631 Rachelle Road, Irving, Texas, the same C. D. WYCHE mentioned in commitment letter 11/6/67 by CONSUMERS to Max Triplett. Endorsement constitutes acknowledgement by endorsees that the money represented by this check is the only remaining condition to funding the loan committee (sic commitment) and that endorsees will return the $14,250.00 to Melvin E. Rueckhaus, Attorney for E. S. Tubin, within 30 days if the loan is not funded as per agreement before that time.

2. One check in the amount of $2,250 was drawn by Rabin on the C.I.C. account and made payable to Joe Hodges. Rabin also drew a second check for Hodges in the amount of $3,000. A third was drawn by Rabin for Cowart in the amount of $3,000. And on the next day, Rabin drew one for "cash" for $3,750.

3. One of the conditions precedent to the giving of the loan was that the note, in return for the loan, be secured by a first mortgage lien on all the "Ranch" properties, namely South Mesita Ranch—21,450 acres; land of the town of Madrid—400 acres plus all improvements, buildings and structure in said town; liquor license assignment then in effect; locomotive and all cars; 9780 acres

mineral rights plus approximately 900 additional acres to be further legally identified.

4. Originally, the loan procurement fee was set at 1% of the total loan amount—1% of $2,850,000, being equal to $28,500; but later, the parties agreed to a lesser percentage of of ½ of 1% of $14,250.

5. The Fourth Circuit of Appeals in Ross v. Peck Iron & Metal Co., 264 F.2d 262, 269 (1959) said that "a cashier's check is a bill of exchange drawn by a bank upon itself, accepted in advance by the act of issuance, and is a non-countermandable promise by the bank to pay, a primary obligation of the bank."

## I. *Legal Aspects*

■ A forged endorsement on an otherwise effective negotiable instrument generates two basic types of liability for a collecting bank, such as Fair Park National Bank. The first involves the breaching of certain warranties established in the U.C.C. to protect the commercial negotiation process between individuals, banks and other entities. Under Sections 3–417(2)(b), 4–207(2)(b) and 4–207(3) of the U.C.C.,[6] a collecting bank warrants to the drawee-payor bank that all signatures are genuine and authorized. In the instant case, First National Bank of Albuquerque, the drawee payor bank, need not nor does not make such a breach of warranty claim since it received full payment upon Reuckhaus' original purchase of the check.[7]

Consequently, the only unreimbursed party *before* trial was the plaintiff Tubin in whose behalf Reuckhaus originally purchased the check. His status as true owner of the cashier's check brings the second type of liability into play—liability on the contract itself. The general rules applicable to this case are found in §§ 3–419(a)(3) & 3–419(c). Section 3–419(a)(1) states the general principle of "conversion on a contract" which provides the overall direction for the application of the remaining provisions under § 3–419. Most significantly, it says that "An instrument is converted when . . . it is paid on a forged indorsement."[8]

The full import of this directive, especially as it applies herein, is treated in Comment 3 of § 3–419:

> It (§ 3–419(a)(3)) adopts the prevailing view of decisions holding that payment on a forged instrument is not acceptance, but even though made in good faith it is an exercise of dominion and control over the instrument inconsistent with the rights of the owner, and results in liability for conversion.

Texas law, to which this Court is herein bound, has adopted this principle of commercial law for many years.[9] For example, in Fidelity & Deposit Co. of Maryland v. Fort Worth National Bank, 65 S.W.2d 276, a Texas Com. Appeals Court, in a case involving the forged endorsements of a company's checks by an employee, said:

> [A] collecting bank which accepts a check on another bank on a forged indorsement acquires no title thereto, and holds the proceeds thereof, when collected from the drawee bank, for the rightful owner, who may recover from the collecting bank as for money had and received, even though such bank has fully paid over and accounted for the same to the forger without knowledge or suspicion of the forgery.[10]

■ Although the *Fidelity* case came much before Texas' adoption of the U.C.C., its holding still remains applicable today. Under Section 4–105(d) of the

---

6. Vernon's Texas Code Annotated, Business & Commerce, Vol. 2.

7. A collecting bank which takes an instrument containing a forged endorsement thereby fails to take good title under § 3–404(1) and § 1–201(43) and thus breaches its warranty of genuineness of title when it presents the instrument to a drawee. The collecting bank is then liable to the drawee bank for the amount paid to it by the drawee bank. First National Bank of Mineola, Texas, v. Farmers & Merchants State Bank of Athens, Texas, Tex.Civ.App., 417 S.W.2d 37 (1967).

8. Comment 3, speaking of § 3–419(a)(3)'s purpose says: "It adopts the prevailing view of decisions holding that payment on a

forged indorsement is not an acceptance, but even though made in good faith it is an exercise of dominion and control over the instrument inconsistent with the rights of the owner, and results in liability for conversion."

9. *See,* First National Bank in St. Louis v. State of Missouri at information of Barrett, Attorney General, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486 (1924).

10. The Supreme Court of Texas apparently agreed with the holding and logic of the *Fidelity* case, since it cited and quoted it in First State Bank of Bellaire v. Citizens National Bank & Trust, Tex.Civ.App., 407 S.W.2d 365, 368 (1966).

U.C.C., a collecting bank is any bank, except the payor bank, which handles an item for collection. The defendant Fair Park National Bank, therefore, qualifies as a collecting bank since it handled the cashier's check for collection from the First National Bank of Albuquerque.

■ The enactment of the U.C.C. would also not operate to change the party to whom the collecting bank, Fair Park, is liable. In this situation the rightful owner of the check is E. S. Tubin, whose attorney, Melvin Reuckhaus was the original payee of the cashier's check.

■ This conclusion results from an analysis of the U.C.C. originated concept of negotiation. Under § 3.202, negotiation of an "order" instrument occurs when delivery, together with any necessary endorsements, is accomplished so that the transferee becomes a qualified "holder" of that instrument. In the present case, Fair Park could not stand in the shoes of either a "holder" or a "holder in due course" [11] because C. D. Wyche's special endorsement was forged. According to § 3.204(a) a special endorsement is one which specifies the person to whose order the instrument is made payable. Reuckhaus, in endorsing the check as the original payee, required that in order for further negotiation of the check to occur, a collecting bank should "pay to the order of Consumer's Investment Company and Charles D. Wyche, Sr." Thus, the $14,250.00 cashier's check became a specially endorsed instrument and could only be negotiated by both Wyche's and C.I.C.'s special endorsements together.[12] The forgery of Wyche's signature rendered both special endorsements inoperative under § 3–

404(a) [13] and insofar as § 3–204(a) is concerned prevented the attempted negotiation.

■ By specially endorsing the check, the payee Reuckhaus in effect was saying that he desired only his enumerated endorsees or those persons who they desired by further negotiation, to receive the proceeds of the check. When the defendant collecting bank paid the proceeds to a forger, the payee's specific wishes were not carried out and under § 3–419(1)(c) it converted the payee's funds. Placing the funds received into the C.I.C. account, an account owned by one of its customers, does not alter this conclusion insofar as the collecting bank is concerned. When a payee specially endorses a check, he remains the rightful and deserving owner until his designated special endorsees—in this case, Wyche and C.I.C.—endorse.

The Court is of the opinion that Fair Park National Bank is liable to plaintiff upon the conversion theory. Defendants Meyer Rabin and Consumer's Investment Company, though served with citation, wholly failed to appear and defend. Accordingly, joint and several judgment will be rendered against defendant Fair Park National Bank, Meyer Rabin and Consumer's Investment Company and in favor of E. S. Tubin in the amount of $14,250.00 plus interest and costs.

■ Although Charles Cowart is named as a defendant, it appears that service or citation was never perfected upon him and as to him the case is dismissed.

■ As heretofore stated the signature of C. D. Wyche was forged and the evidence wholly fails to show that C. D. Wyche participated in any way in the

---

11. One of the requirements for a "holder in due course" status is that the person or entity first be a "holder". § 3.302(a).

12. Comment 2 of § 3.202 says:
    Any instrument which has been specially endorsed can be negotiated only with the endorsement of the special endorsee as provided in Section 3—204 on special endorsements.

13. Section 3–404(a) says "Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it." The Court has found no ratification by Wyche of his forged endorsement nor does it see any application of an estoppel argument present.

endorsement of the check or in any way shared in any of the proceeds. Recovery from the Estate of C. D. Wyche is therefore denied.

Plaintiff's attorney is requested to prepare and submit appropriate form of judgment.