# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 9, 2012

No. 11-10320

Lyle W. Cayce
Clerk

VERNON T. JONES, JR., as Receiver for W Financial Group, L.L.C.,

Plaintiff - Appellee,

v.

WELLS FARGO BANK, N.A.,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before KING, JOLLY and WIENER, Circuit Judges.

PER CURIAM:

Court-appointed receiver Vernon T. Jones, Jr. brought suit against Wells
Fargo Bank, N.A., for conversion and breach of contract with respect to a
cashier's check purchased by W Financial Group that Wells Fargo reaccepted for
deposit into an account other than that of the named payee, without the proper
endorsement. The district court found Wells Fargo liable for conversion. On
appeal, Wells Fargo argues that the court erred in finding that Wells Fargo
converted the check, and in rejecting certain defenses. We affirm.

No. 11-10320

## I. FACTUAL AND PROCEDURAL BACKGROUND

In September 2006, Adley Abdulwahab ("Wahab") opened a business cash management account on behalf of W Financial Group, L.L.C. ("W Financial") with Defendant–Appellant Wells Fargo Bank, N.A. ("Wells Fargo"). Wahab, along with Michael K. Wallens and Michael K. Wallens, Jr., was an authorized signer on the account. W Financial received a Business Account Agreement, which described the terms governing its account.

On January 29, 2007, Wahab withdrew $1,701,250 from W Financial's account at Wells Fargo's Post Oak branch in Houston. Wahab used the funds to buy a cashier's check payable to Lubna Lateef, Misba Lateef, Shahed Lateef, and Zahed Lateef (the "Lateefs"). Later that same day, Wahab returned to a different Wells Fargo branch in Spring, Texas. Wahab deposited the check into the Wells Fargo account of a separate entity, CA Houston Investment Center, L.L.C. ("CA Houston"). Wahab was CA Houston's managing member, and the only authorized signer on its account. The Lateefs never received or endorsed the cashier's check. Rather, Wells Fargo stamped the following on the back of the check: "CREDITED TO THE ACCOUNT OF WITHIN NAMED PAYEE LACK OF ENDORSEMENT GUARANTEED WELLS FARGO BANK, N.A."

In March 2008, the Securities and Exchange Commission ("SEC") brought an enforcement action against W Financial, *SEC v. W Financial Group, LLC, et al.*, No. 3:08-CV-0499-N, alleging that it had engaged in the fraudulent sale of securities.[1] The United States District Court for the Northern District of Texas, where that action was filed, entered an order appointing Vernon T. Jones, Jr. ("Receiver" or "Jones") as receiver for W Financial for the purpose of recovering

---

[1] According to the SEC, W Financial had illegally conducted an unregistered securities offering, raising $17.9 million from the sale of investments to at least 182 people. The securities did not have the quality, safety, or liquidity that W Financial represented to investors.

2

No. 11-10320

the company's assets for the benefit of its investors. The order further authorized Jones to institute all actions or proceedings necessary to recover W Financial's assets, and to file such actions in the United States District Court for the Northern District of Texas.

Pursuant to his responsibilities as receiver, Jones filed this action against Wells Fargo in 2009, asserting causes of action for conversion and breach of contract based upon the January 29, 2007 transaction. The parties filed cross motions for summary judgment, acknowledging that the case hinged solely on questions of law. The district court granted the Receiver's motion for summary judgment and denied Wells Fargo's cross motion, finding Wells Fargo liable for conversion and responsible for $1,701,250 in damages, plus interest. The court found the breach of contract claim moot, and rejected Wells Fargo's affirmative defenses. Wells Fargo timely appealed.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*, applying the same standard as the district court. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When reviewing a summary judgment motion, we draw all reasonable inferences in favor of the nonmoving party. *Turner*, 476 F.3d at 343; *see also Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001) ("On cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party.").

## III. DISCUSSION

*A. Conversion*

Under Texas law, which has adopted most provisions of the Uniform Commercial Code ("UCC") verbatim, a bank may be liable for conversion of a

3

cashier's check if "a bank makes or obtains payments with respect to the instrument for a person not entitled to enforce the instrument or receive payment." TEX. BUS. & COM. CODE § 3.420(a).

In this case, CA Houston (through Wahab as its agent),[2] and not W Financial, is the entity that sought to enforce the instrument. As Wells Fargo states, "W Financial did not enforce the Cashier's Check as it is not the party that received payment. CA Houston was; thus, CA Houston enforced the Cashier's Check." The resolution of the Receiver's conversion claim thus depends upon whether CA Houston was "entitled to enforce" the cashier's check.

The UCC lists the following persons who are "entitled to enforce" an instrument: "(I) the holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of a holder, or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to 3.309 or 3.418(d)." TEX. BUS. & COMM. CODE § 3.301. CA Houston was neither a holder of the instrument nor "a person not in possession of the instrument who is entitled to enforce the instrument." A "holder" is defined as "the person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession." *Id.* § 1.201(b)(21)(A). CA Houston was not a holder under the UCC, because the check was payable to the Lateefs, not to Wahab, CA Houston, or to "bearer."[3] *Id.* Furthermore, the parties agree that Wahab was in physical possession of the check, precluding him or CA Houston from qualifying as "a person not in possession of the instrument who is entitled to enforce the instrument." *Id.*

---

[2] As noted above, Wahab was the sole authorized signer on the CA Houston account.

[3] A cashier's check is "payable to bearer" if it: "(1) states that it is payable to bearer or to the order of bearer or otherwise indicates that the person in possession of the promise or order is entitled to payment; (2) does not state a payee;  or (3) states that it is payable to or to the order of cash or otherwise indicates that it is not payable to an identified person." TEX. BUS. & COMM. CODE § 3.109(a).

No. 11-10320

Thus, CA Houston was entitled to enforce the check only if it qualified as "a nonholder in possession of the instrument who has the rights of a holder." *Id.* § 3.301(ii). To determine CA Houston's rights, we must consider the rights of the other entities in this transaction. Here, W Financial would be classified as the check's "remitter." A "remitter" is "a person who purchases an instrument from its issuer if the instrument is payable to an identified person other than the purchaser." *Id.* § 3.103(a)(15). "The remitter, although not a party to the check, is the owner of the check until ownership is transferred to Seller by delivery. This transfer is a negotiation because Seller becomes the holder of the check when Seller obtains possession." *Id.* § 3.201 cmt. 2.[4] The November 2002 official comments to Section 3.301 now make clear that a remitter falls within the definition of a "nonholder in possession," and is thus entitled to enforce a check.[5] The comments state:

> A nonholder in possession of an instrument includes a person that acquired rights of a holder by subrogation or under Section 3-203(a). *It also includes both a remitter that has received an instrument from the issuer but has not yet transferred or negotiated the instrument to*

---

[4] Ownership status does not necessarily make an entity a holder or otherwise entitled to enforce an instrument. The concepts of ownership and entitlement to enforce are distinct. A recent report of the Permanent Editorial Board for the Uniform Commercial Code highlights this important distinction, albeit in the separate context of mortgage notes. That report explains, "[w]hile, in many cases, the person entitled to enforce a note is also its owner, this need not be the case. The rules that determine whether a person is a person entitled to enforce a note do not require that person to be the owner of the note, and a change in ownership of a note does not necessarily bring about a concomitant change in the identity of the person entitled to enforce the note." REPORT OF THE PERMANENT EDITORIAL BOARD FOR THE UNIFORM COMMERCIAL CODE, APPLICATION OF THE UNIFORM COMMERCIAL CODE TO SELECTED ISSUES RELATING TO MORTGAGE NOTES, at 8 (Nov. 2011). The UCC confirms that "[a] person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument." TEX. BUS. & COMM. CODE § 3.301.

[5] The UCC official commentary is an authoritative interpretation of the Code. Texas courts "are mindful of the official comments," as they "provide valuable guidance to the meaning and purpose of the Code as enacted in Texas." *Morgan Bldgs. & Spas, Inc. v. Turn-Key Leasing, Ltd.*, 97 S.W.3d 871, 880 (Tex. App.—Dallas 2003). Barring a contrary interpretation from the Texas courts, we are guided by the official commentary.

*another person* and also any other person who under applicable law is a successor to the holder or otherwise acquires the holder's rights.

*Id.* § 3.301 cmt (emphasis added).

The only conceivable manner in which CA Houston could have acquired W Financial's enforcement rights in this case is through a transfer of the cashier's check from W Financial to CA Houston. TEX. BUS. & COMM. CODE § 3.203(b) ("Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course."). There is, however, no evidence of a transfer. A transfer occurs only "when [an instrument] is delivered by a person other than its issuer for the purpose of giving the person receiving the delivery the right to enforce the instrument." *Id.* § 3.203(a). No such purpose is evident here. Indeed, Wells Fargo's initial brief in fact states that a transfer "never occurred," and that W Financial "retained possession of the Cashier's Check." Although Wells Fargo's later briefing suggests that a transfer did occur, it provides no support for such an assertion. In any event, Wells Fargo's failure to argue transfer in its initial brief waives the argument for our purposes. *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("An appellant abandons all issues not raised and argued in its *initial* brief on appeal.") (citations omitted). As such, CA Houston never obtained W Financial's right to enforce the instrument. Because Wells Fargo made payment on the cashier's check to CA Houston, an entity that was not entitled to enforce the instrument, Wells Fargo is liable for conversion under Section 3.420.

The district court also concluded that Wells Fargo is liable for conversion because it "deposited the cashier's check without the necessary indorsement." We agree. As noted above, Wells Fargo accepted and processed the cashier's check even though it had not been endorsed by the Lateefs. Instead, it affixed the following stamp to the cashier's check before depositing it into the account

of CA Houston: "CREDITED TO THE ACCOUNT OF WITHIN NAMED PAYEE LACK OF ENDORSEMENT GUARANTEED WELLS FARGO BANK, N.A." The account number for CA Houston was handwritten below this stamp. As Wells Fargo both issued the check and accepted it for deposit, it is both the payor bank and the depositary bank.

The UCC places the burden on the first bank in the collection chain to ensure an endorsement's authenticity. *Sw. Bank v. Info. Support Concepts, Inc.*, 85 S.W.3d 462, 465 (Tex. App.—Fort Worth 2002), *aff'd*, 149 S.W.3d 104 (Tex. 2004) (citing *Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984)). In Texas, "[a] bank's payment of an instrument on a missing endorsement results in conversion of the instrument." *Ames*, 672 S.W.2d at 450. This principle was applied in *Southwest Bank*, 85 S.W.3d 462. In that case, an employee of Information Support Concepts, Inc. ("ISC"), stole checks made out to ISC, wrote "Deposit Only" on the back of each one, and deposited them into her personal account at Southwest Bank. *Id.* at 463. Although none of these checks bore ICS's endorsement, Southwest Bank accepted the deposits and obtained payment on the checks. When ICS discovered what had happened, it sued Southwest Bank for conversion under Section 3.420. *Id.* The trial court found Southwest Bank liable. The court of appeals affirmed, reasoning:

> if a depository bank pays a check to one other than the actual payee or to his order, or is mistaken as to the payee's identity or is paid upon a forged endorsement of the payee, the depository bank is responsible. *Under section 3.420, therefore, a depository bank is liable for conversion if it obtains payment on an instrument that is missing a necessary endorsement.*
>
> The depository bank is ultimately liable in the case of a forged or missing endorsement because of its warranty to the payor bank under section 4.208(a)(1). A depository bank warrants to a payor bank to which a missing endorsement check is presented for payment that it was *entitled to enforce the draft* on behalf of a person entitled to enforce the draft. Thus, a depository bank is liable

for conversion as a matter of law when it accepts for deposit into a third party's account checks that were not endorsed in the name of the payee.

*Id.* at 465-66 (citations omitted) (first emphasis added).[6] The court then concluded that "Southwest Bank consistently overlooked the missing endorsements . . . and in doing so converted the checks pursuant to section 3.420." *Id.* at 466. The Supreme Court of Texas affirmed. 149 S.W.3d 104 (Tex. 2004). *Southwest Bank* relied in large part upon the official UCC commentary, which provides that Section 3.420(a) "covers cases in which a depositary or payor bank takes an instrument bearing a forged indorsement." TEX. BUS. & COMM. CODE § 3.420 cmt. 1. The court found no relevant distinction between an instrument with a missing endorsement and one with a forged endorsement, consistent with earlier Texas decisions. *See Longview Bank & Trust Co. v. First Nat'l Bank of Azle*, 750 S.W.2d 297, 299 (Tex. App.—Fort Worth 1988) ("The situation of paying on an instrument missing a necessary endorsement is analogous to paying on an instrument with forged or unauthorized endorsements.").[7]

It is undisputed that neither W Financial, CA Houston, nor Wahab was the payee of the check, and that the Lateefs never endorsed the check. When

---

[6] Although the Receiver maintains that this conversion claim rests on Section 3.206 rather than Section 3.420, *Southwest Bank* in fact concluded that Section 3.420 covers conversion claims based upon a missing endorsement. 85 S.W.3d at 465-66.

[7] Other jurisdictions agree. *See, e.g., Kelly v. Cent. Bank & Trust Co. of Denver*, 794 P.2d 1037, 1042 (Colo. App. 1989) ("[A] check is converted when it is paid on a forged indorsement . . . . If such payment occurs on a check with no indorsement or a missing indorsement, it is the legal equivalent of payment on a forged instrument."); *Gen. Motors Acceptance Corp. v. Abington Cas. Ins. Co.*, 602 N.E.2d 1085, 1089 n.8 (Mass. 1992) ("A missing endorsement is equivalent to a forged endorsement for the purposes of a [former] § 3-419 conversion suit."); *Mandelbaum v. P & D Printing Corp.*, 652 A.2d 1266, 1268 (N.J. Super. Ct. App. Div. 1995) ("Payment of a draft or check with a missing endorsement is the equivalent of payment of a forged instrument and constitutes conversion against the non-signing payee.").

No. 11-10320

Wahab deposited the cashier's check into CA Houston's account, Wells Fargo should have first required the Lateefs' endorsement. Depositing the cashier's check into CA Houston's account, without the Lateefs' endorsement, constitutes conversion as stated in *Southwest Bank*. CA Houston's status as a bank customer does not relieve Wells Fargo of its obligation under the UCC to ensure that instruments are properly endorsed. *See Sw. Bank*, 85 S.W.3d at 465 ("[T]he UCC generally places the burden on the first bank in the collection chain to insure the requisite endorsements are present and authentic . . . ."); *see also Tubin v. Rabin*, 389 F. Supp. 787, 789 (N.D. Tex. 1974) ("The statutory scheme of the U.C.C. requires a depository or collecting bank to authenticate the signatures on any instrument presented to it.").

Wells Fargo contends that the incorrect endorsement is "immaterial," and that the stamp did not make it liable to W Financial for conversion. It states that the stamp only protects those parties, if any, who became holders down the chain from Wells Fargo. For this reason, Wells Fargo concludes that W Financial, and hence the Receiver, lack standing to sue on the basis of the missing endorsement as a matter of law.  We disagree.

The only relevant Texas decision, *Tubin v. Rabin*, 382 F. Supp. 193 (N.D. Tex. 1974), permitted the purchaser of a cashier's check, as the "true owner" of that check, to recover from the collecting bank for conversion on a fraudulently endorsed cashier's check. *Id.* at 194-96. This is consistent with other authority in this area. As one court has reasoned, "in the case of a remitter, the depository bank is technically dealing with the funds of the issuing bank, yet it is the remitter that has the direct interest in the funds. Therefore, if the depository bank acts wrongfully with a cashier's check, the remitter will be injured and will have an incentive to sue the depository bank." *Old Republic Nat'l Title Ins. Co. v. Bank of E. Asia Ltd.*, 291 F. Supp. 2d 60, 68 (D. Conn. 2003); *see also Lawrence v. Cent. Plaza Bank & Trust Co.*, 469 So. 2d 201, 204 (Fla. App. 2 Dist.

No. 11-10320

1985) (holding that purchaser of a cashier's check had standing to bring conversion claim against bank based upon forged endorsement until delivery to the named payee) (citing *Tubin*, 382 F. Supp. 193); *see also* WILLIAM D. HAWKLAND & LARY LAWRENCE, 6 HAWKLAND UCC SERIES § 3-420:4 (Nov. 2011) ("While it makes little sense to say that a drawer has a property right in his own promise, it makes a lot of sense to say that the remitter, prior to delivery, has a property right in the issuing bank's promise. A remitter should be found to have an action for conversion on a bank check."); Gregory E. Maggs, *Determining the Rights and Liabilities of the Remitter of a Negotiable Instrument: A Theory Applied to Some Unsettled Questions*, 36 B.C. L. REV. 619, 654 (1995) ("Section 3-420(a) . . . excludes drawers and persons who never received delivery from the class of possible plaintiffs, but does not exclude remitters. Remitters therefore may recover under the provision.").[8]

We conclude that Wells Fargo's actions constitute conversion under Section 3.420. Having so concluded, we now turn to Wells Fargo's defenses, namely W Financial's alleged failure to perform a condition precedent and the *in pari delicto* doctrine.

*B. Condition Precedent*

Wells Fargo asserts that W Financial should have discovered and reported the conversion of the cashier's check after reviewing its February 2007 account

---

[8] Wells Fargo directs us to authorities that seemingly warrant a different conclusion. We do not, however, find them persuasive. Aside from the fact that these authorities were not decided under Texas law, each is distinguishable because the party bringing suit lacked an ownership interest in the cashier's check at issue. *See Lewis v. Tel. Emps. Credit Union*, 87 F.3d 1537, 1552 (9th Cir. 1996) (holding that remitters of cashier's checks lacked standing to sue bank for conversion because they had no rights in the instruments); *Lassen v. First Bank Eden Prairie*, 514 N.W.2d 831, 838-39 (Minn. Ct. App. 1994) (holding that first holder of cashier's checks lacked standing to bring conversion claim after delivery of the checks to another party, but recognizing that the checks were the holder's property "after he purchased them from First Bank"); *C.A.L., Inc. v. Worth*, 813 S.W.2d 12, 16 (Mo. Ct. App. W.D. 1991) ("[T]he remitter, who has purchased a cashier's check, is not the owner of the check and is not the proper party to sue for conversion.").

statement. Wells Fargo maintains that W Financial's failure to do so precludes the Receiver from pursuing the conversion claim, as the reporting obligation in its Account Agreement constitutes a condition precedent. We disagree.

As noted above, W Financial signed an Account Agreement when it opened its account with Wells Fargo. This Account Agreement states that, "[w]ithin thirty (30) days after the Bank mails or otherwise makes the statement or other Account-Related Information available to you, you will notify the Bank of any claim for credit or refund due, for example, to an erroneous or unauthorized debit, a missing signature, an unauthorized signature, or an alteration . . . ." It additionally provides that, "[w]ithin six (6) months after the Bank mails or otherwise makes the statement or other Account-Related Information available to you, you will notify the Bank of any claim for credit or refund resulting from a forged, unauthorized, or missing endorsement." Failure to notify the bank, according to the Agreement, "release[s] the Bank from all liability for the Items charged to your Account and for all other transactions covered by the statement or other Account-Related Information."

Account agreements, such as the one here, are governed by Section 4.406 of the Texas Business and Commerce Code.[9] Section 4.406(a) provides, "[a] bank that sends or makes available to a customer a statement of account showing payment of items for the account shall either return or make available to the customer the items paid or provide information in the statement of account

---

[9] The district court found that the time limitation in the Account Agreement was void because it was a contractual provision that shortened the statutory limitations period to less than two years, in violation of Texas law. TEX. CIV. PRAC. & REM. CODE § 16.070(a) ("A stipulation, contract, or agreement that establishes a limitations period that is shorter than two years is void in this state."). The district court erred in this determination. Texas courts have viewed contractual provisions adopted under Section 4.406 as similar to conditions precedent, not statutes of limitation. *Am. Airlines Emp. Fed. Credit Union v. Martin*, 29 S.W.3d 86, 95 (Tex. 2000) ("The notice requirement of section 4.406(d) . . . is similar to a condition precedent."); *see also Canfield v. Bank One, Tex., N.A.*, 51 S.W.3d 828, 835 (Tex. App.—Texarkana 2001) (same).

sufficient to allow the customer reasonably to identify the items paid." TEX. BUS. & COMM. CODE § 4.406(a).  If such a statement is provided to the customer, the customer "must exercise reasonable promptness in examining the statement . . . to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized." *Id.* § 4.406(c). The section further provides, "[w]ithout regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer (Subsection (a)) discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration." *Id.* § 4.406(f).[10]

We find Wells Fargo's reliance upon the account statement entirely misplaced, as W Financial could not possibly have discovered the missing endorsement on the cashier's check through a review of its statement. It is elemental that a cashier's check is drawn on a bank, not on a customer's account. *See, e.g.*, *Rogers v. McDorman*, 521 F.3d 381, 383 (5th Cir. 2008) ("A cashier's check is a check drawn by a bank on itself; it is an obligation of the bank that the bank is committed to honor . . . .") (internal quotation marks and footnote omitted); TEX. BUS. & COMM. CODE § 3.104(g) ("'Cashier's check' means a draft with respect to which the drawer and the drawee are the same bank or branches

---

[10] Section 4.103(a) permits parties to alter the effect of Article 4's provisions by agreement as long as the agreement does not disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care, or limit the measure of damages for such a lack of good faith or failure by the bank. TEX. CIV. PRAC. & REM. CODE § 4.103(a); *Basse Truck Line, Inc. v. First State Bank*, 949 S.W.2d 17, 21 (Tex. App.—San Antonio 1997, writ denied). Deposit agreements, which may shorten the statutory time limits on the notice required to be given by a customer, are enforceable as a contract between the parties. *Martin*, 29 S.W.3d at 96.

of the same bank."). The remitter's bank statement would therefore not reflect the deposit of a cashier's check into a third party's account.

Indeed, the February 2007 account statement upon which Wells Fargo relies provides only the date of the January 2007 transaction, the dollar amount, and notes that the transaction was a "Withdrawal Made In A Branch/Store." At best, this information reflects that someone withdrew funds from W Financial's account on the date in question. It does not show Wahab's purchase of the cashier's check itself nor his subsequent deposit of that check into CA Houston's account without a proper endorsement. Therefore, the account statement could not possibly have alerted W Financial to the deposit of the check into CA Houston's account, which is the very basis of its conversion claim. Simply put, W Financial cannot be held responsible for failing to notice a transaction that the account statement does not reveal in the first place.

Wells Fargo contends that the account statement should have alerted W Financial to the conversion because it "shows no credit or redeposit" of the funds withdrawn on January 29, 2007. This argument ignores the fact that no credit or redeposit would have been reflected even if the cashier's check was processed as intended, namely by delivery to the Lateefs. The simple absence of a redeposit cannot possibly have put W Financial on notice of the fact that the check was deposited into CA Houston's account rather than the Lateefs' account.

We conclude that Wells Fargo cannot rely upon the condition precedent in its Account Agreement to avoid liability for conversion of the cashier's check.

*C.* In Pari Delicto *Doctrine*

Wells Fargo argues that it was entitled to summary judgment based on the *in pari delicto* doctrine, as Wahab was primarily at fault for the conversion of the cashier's check. Furthermore, it contends that it is incorrect to differentiate between W Financial as principal and Wahab as agent, when the bank was only following Wahab's orders. The district court found the *in pari delicto* defense

inapplicable, reasoning that Wahab's actions could not be rightfully imputed to W Financial because Wahab's actions were taken "against the interest and authorization of the principal." We conclude that the district court properly rejected Wells Fargo's *in pari delicto* defense.

The doctrine of *in pari delicto* provides that wrongdoers ought to bear the consequences of their wrongdoing without legal recourse against each other. The doctrine embodies "the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct, and is undergirded by the concerns, first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008) (internal quotation marks and footnote omitted). A court will not extend aid to either of the parties to a criminal act or listen to their complaints against each other but will leave them where their own acts have placed them. *In pari delicto* is an equitable, affirmative defense, which is controlled by state common law. *See Pinter v. Dahl*, 486 U.S. 622, 632 (1988); *see also In re Food Mgmt. Grp.*, 380 B.R. 677, 693 (Bankr. S.D.N.Y. 2008).

Wells Fargo's *in pari delicto* argument fails to acknowledge the important distinction between W Financial as a corporation and Wahab as an individual. While it is undisputed that Wahab played a central role in the conversion of the cashier's check, W Financial is composed of more than Wahab or the other individuals who operated the company. "The legal concept that a corporation is a distinct entity separate from its stockholders, officers and directors is fundamental to the law of corporation." *Wynne v. Adcock Pipe & Supply*, 761 S.W.2d 67, 68 (Tex. App.—San Antonio 1988) (citation omitted). A corporation is "separate and distinct from the members who comprise it, with attributes, rights, and liabilities of its own," even though it must act through its officers or agents. *Hirsch v. Tex. Lawyers' Ins. Exch.*, 808 S.W.2d 561, 563 (Tex. App.—El

14

No. 11-10320

Paso 1991); *see also Singh v. Duane Morris, L.L.P.*, 338 S.W.3d 176, 181-82 (Tex. App.—Houston [14 Dist.] 2011) ("A corporation is a separate legal entity from its shareholders, officers, and directors.") (citation omitted). To conclude that W Financial stands *in pari delicto* simply because Wahab is a wrongdoer ignores the fundamental distinction between a corporation and its officers. W Financial itself does not stand *in pari delicto* to Wells Fargo, even if Wahab does.

The distinction between a corporation and its officers or agents is reinforced by the appointment of a receiver. A receiver is "the representative and protector of the interests of all persons, including creditors, shareholders and others, in the property of the receivership." *Sec. Trust Co. of Austin v. Lipscomb Cnty.*, 180 S.W.2d 151, 158 (Tex. 1944). The receiver "has a duty to pursue a corporation's claims." *Akin, Gump, Strauss, Hauer and Feld, L.L.P. v. E Court, Inc.*, No. 03-02-00714-CV, 2003 WL 21025030, at *5 (Tex. App.—Austin 2003) (quoting *Burnett v. Chase Oil & Gas, Inc.*, 700 S.W.2d 737, 741 (Tex. App.—Tyler 1985, no writ)). Although a receiver generally "has no greater powers than the corporation had as of the date of the receivership," it is well established that "when the receiver acts to protect innocent creditors . . . he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so." *Id.* (quoting *Guardian Consumer Fin. Corp. v. Langdeau*, 329 S.W.2d 926, 934 (Tex. Civ. App.—Austin 1959, no writ).[11] The receiver thus

---

[11] As noted above, the Receiver in this case was appointed by the district court during the SEC enforcement action. District courts "may appoint receivers as part of their broad powers to remedy violations of federal securities laws." *SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010). As one court has explained, "[r]eceivers appointed at the SEC's request are equipped with a variety of tools to help preserve the status quo while the various transactions [are] unraveled . . . to obtain an accurate picture of what transpired. . . . [A] primary purpose of appointing a receiver is to conserve the existing estate. . . . Receivers are directed to marshal the assets of the defendant, and prevent the dissipation of [the] defendant's assets pending further action by the court." *Eberhard v. Marcu*, 530 F.3d 122, 131-32 (2d Cir. 2008) (internal quotation marks and citations omitted). The rights of a receiver are determined by state law. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 83 (1994); *see also* 28 U.S.C. § 959(b).

15

acts on behalf of the corporation as a whole, an entity separate from its individual bad actors.

In this case, the district court specifically authorized the Receiver to pursue actions for the benefit of "all investors who may be the victims of the fraudulent conduct" of W Financial and to institute actions "as may in his discretion be advisable or proper for the identification, collection, recovery, preservation, liquidation, protection, and maintenance of the Receivership Assets or proceeds therefrom." The Receiver brought this suit on behalf of W Financial to recover funds for defrauded investors and other innocent victims. Application of *in pari delicto* would undermine one of the primary purposes of the receivership established in this case, and would thus be inconsistent with the purposes of the doctrine. *See Lewis v. Davis*, 199 S.W.2d 146, 151 (Tex. 1947) (stating that the *in pari delicto* doctrine is "not for the benefit of either party and not to punish either of them, but for the benefit of the public"); *see also id.* (application of the doctrine "depends upon the peculiar facts and equities of the case, and the answer usually given is that which it is thought will better serve public policy").

Other courts have likewise rejected the *in pari delicto* defense in actions brought by receivers to recover assets for investors and creditors. The Seventh Circuit in *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), determined that the doctrine was inapplicable, explaining:

> [T]he defense of *in pari delicto* loses its sting when the person who is in pari delicto is eliminated. *Now that the corporations created and initially controlled by Douglas are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors, we cannot see an objection to the receiver's bringing suit to recover corporate assets unlawfully dissipated by Douglas.* We cannot see any legal objection and we particularly cannot see any practical objection. The conceivable alternatives to these suits for getting the money back into the pockets of its rightful owners are a series of individual suits by the

investors, which, even if successful, would multiply litigation; a class action by the investors—and class actions are clumsy devices; or, most plausibly, an adversary action, in bankruptcy, brought by the trustee in bankruptcy of the corporations if they were forced into bankruptcy.

*Id.* at 754-55 (emphasis added) (citations omitted). Other courts agree. *See, e.g.*, *Javitch v. Transamerica Occidental Life Ins. Co.*, 408 F. Supp. 2d 531, 538 (N.D. Ohio 2006) ("An equity receiver's duties are fashioned and may be modified by the appointing court. Because this Court has expressly given the Receiver's broad authority to pursue claims on behalf of Liberte and the investors, the Receiver is not precluded from these actions under the doctrine of *in pari delicto*."); *Isp.com LLC v. Theising*, 805 N.E.2d 767, 773 (Ind. 2004) ("The receiver is in some respects a new entity, untainted by the corporation's wrongdoing. He is not necessarily barred by *in pari delicto*.") (citing *Scholes*, 56 F.3d at 754).

Wells Fargo relies upon a number of cases that have applied the *in pari delicto* doctrine against bankruptcy trustees. These cases, however, are plainly distinguishable because they rely upon Section 541(a) of the Bankruptcy Code, which limits the debtor estate to interests of the debtor "as of the commencement of the case." 11 U.S.C. § 541(a)(1); *see, e.g.*, *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1150 (11th Cir. 2006) ("If a claim of [debtor] would have been subject to the defense of *in pari delicto* at the commencement of the bankruptcy, then the same claim, when asserted by the trustee, is subject to the same affirmative defense.") (internal quotation marks and citations omitted); *Official Comm. of Unsecured Creditors of R.F. Lafferty & Co., v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 356 (3d Cir. 2001) ("[T]he application of the *in pari delicto* doctrine is affected by the rules governing bankruptcies. . . . [T]he explicit language of section 541 directs courts to evaluate defenses as they existed at the commencement of the bankruptcy."); *Matter of*

No. 11-10320

*Pernie Bailey Drilling Co., Inc.*, 993 F.2d 67, 70 (5th Cir. 1993) (noting that bankruptcy trustee stood *in pari delicto*); *see also In re Hedged-Invs. Assocs., Inc.*, 84 F.3d 1281, 1285 (10th Cir. 1996) ("Though the Seventh Circuit's reasoning in *Scholes* enjoys a certain appeal, both from doctrinal and public policy perspectives, we cannot adopt it in this case. Put most simply, Mr. Sender is a bankruptcy trustee acting under 11 U.S.C. § 541, and bankruptcy law, apparently unlike the law of receivership, expressly prohibits [application of *Scholes*]."). We therefore are not persuaded by Wells Fargo's analogy to bankruptcy trustees.[12]

We conclude that the district court did not err in denying Wells Fargo's *in pari delicto* defense.

*D. Breach of Contract*

The district court found the Receiver's breach of contract claim moot after it granted summary judgment on its conversion claim. Because we affirm the district court's grant of summary judgment on the Receiver's conversion claim, we need not address the breach of contract issue.

### IV. CONCLUSION

In light of the foregoing, the district court's judgment is AFFIRMED.

---

[12] Wells Fargo also cites *Marion v. TDI Inc.*, 591 F.3d 137 (3d Cir. 2010), and *Knauer v. Jonathon Roberts Financial Group, Inc.*, 348 F.3d 230 (7th Cir. 2003), to support its position. The *Marion* court, however, only speculated that a receiver's suit on behalf of a debtor corporation against third parties who allegedly helped the corporation's management harm the corporation "might . . . be vulnerable to the defense of *in pari delicto*," but asserted that this "issue is separate from that of standing, which is what we deal with here." 591 F.3d at 148 n.17. *Knauer* was decided under Indiana law, and reasoned that the equities of that case favored application of *in pari delicto* because the defendants were neither directly involved in the embezzlements at issue nor benefitted from them. *Knauer*, 348 F.3d at 236-37.