KING, Circuit Judge,
dissenting:
Underwriters are more than willing to lose this case if only they can persuade this court to make some Texas law on the so-called “sophisticated-insured exception” to the contra proferentem rule. All are agreed that no Texas court has spoken on whether such an exception exists, let alone on its content. In order to be in a position to rule on the exception, we have to accept Underwriters’ waiver of a challenge to the district court’s conclusion that the policy exclusion at issue is ambiguous. That conclusion of ambiguity is a threshold question of law, which we cannot be precluded from reaching. I would resolve this case by concluding that the exclusion unambiguously applies to bar coverage. I would therefore give Underwriters the win which they abjure and decline their request to be the first court to rule on the scope of the sophisticated-insured exception under Texas law. I respectfully dissent.
I. Waiver
The majority opines, with zero guidance from Texas courts, on the scope of a sophisticated-insured exception to the rule of contra proferentem — the existence of which the majority purports not even to decide. What kind of decision is that? Such judicial gymnastics can easily be avoided here, as the issue the majority resolves becomes germane only if the policy exclusion at issue “is susceptible to more than one reasonable interpretation,” i.e., if it is ambiguous. Evanston Ins. Co. v. Legacy of Life, Inc., 370 S.W.3d 377, 380 (Tex.2012). The majority does not address this threshold issue of ambiguity. Instead, the majority contends that “Underwriters do not appeal the [district court’s] finding of ambiguity,” but rather “challenge only the application of the sophisticated-insured exception and the denial of their Federal Rule of Civil Procedure 59(e) motion.” Although this is an accurate description of the position taken by Underwriters in their opening brief on appeal, it does not tell the whole story. In their summary judgment briefing below, the parties’ dispute largely revolved around the interpretation of the relevant exclusion, Exclusion J — each side contending that the exclusion is unambiguous and should be interpreted in its favor.[1] And although the district *635 court ruled in favor of Appellees on the basis of the contra proferentem doctrine (while rejecting the application of a sophisticated-insured exception), it did so only-after first analyzing Exclusion J and deeming it ambiguous. Despite the opening briefs description of the limited scope of Underwriters’ appeal, Appellees fully briefed their interpretation of Exclusion J, and in reply Underwriters devoted several pages to their argument that, “by its plain language, Exclusion J was triggered when the Receiver obtained Allen Stanford’s voting rights in SFGC.” Underwriters reversed course yet again at oral argument, stating that they are not challenging on appeal the district court’s conclusion that Exclusion J is ambiguous.
With respect, I would refuse to accommodate what appears to be a strategic effort, on behalf of Underwriters, to have this court create new Texas insurance law, writing on a blank slate. Indeed, the Texas Supreme Court recently declined to address the sophisticated-insured exception for the same reason I would here — because the policy provision at issue is unambiguous. See In re Deepwater Horizon, 470 S.W.3d 452, 468-69 (Tex.2015) (“The [contra proferentem ] rule comes into play •only if there is more than one reasonable interpretation of an insurance policy. Because that is not the situation here, we do not answer the second question [regarding the sophisticated-insured exception].” (internal citation omitted)). Even when faced with what might be called a “friendly suggestion” at oral argument that Exclusion J may unambiguously apply in their favor, Underwriters conceded that they were not making that argument. The only possible motivation for such a concession is to force a ruling on the sophisticated-insured exception — a ruling which will undoubtedly impact Underwriters in future cases.
Underwriters’ maneuvering has triggered an opinion as to the scope of the sophisticated-insured exception.[2] Yet “[flederal courts are not in the business of rendering advisory opinions.” C & H Nationwide, Inc. v. Norwest Bank Texas NA, 208 F.3d 490, 493 (5th Cir.2000). Absent ambiguity, there is no reason for this court to address the contours of the sophisticated-insured exception to the contra proferentem rule. We have the discretion to address such a threshold legal issue, despite Underwriters’ failure to challenge it in their opening brief. See U.S. Nat’l Bank of Oregon v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 445, 447, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (concluding that the D.C. Circuit did not err in addressing a threshold legal issue which “Respondents did not challenge ... in their opening brief in the Court of Appeals,” as “a court may consider an issue antecedent to ... and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief’ (internal quotation marks omitted)); see id. at 447 (“The contrary conclusion would permit litigants, by agreeing on the legal issue presented, to extract ... an opinion that would be difficult to characterize as anything but advisory.”); cf. H & R Block E. Enters., Inc. v. Raskin, 591 F.3d 718, 723-24 (4th Cir.2010) (concluding that the court was not bound to accept the parties’ stipulation as to a threshold issue that was “unresolved and essential” to the remaining claims, as “the parties were effectively seeking an advisory opinion” on those remaining claims).
Underwriters cannot, in essence, stipulate to the legal question of ambiguity in *636 an attempt to prompt new law on an issue that may not be implicated in this case. See U.S. Nat’l Bank of Oregon, 508 U.S. at 448, 113 S.Ct. 2173 (“[T]he Court of Appeals acted without any impropriety in refusing to accept what in effect was a stipulation on a question of law.”); Equitable Life Assur. Soc’y of U.S. v. MacGill, 551 F.2d 978, 983 (5th Cir.1977) (“[I]t is well settled that a court is not bound to accept as controlling stipulations as to questions of law.”); see also Fiess v. State Farm Lloyds, 202 S.W.3d 744, 753 (Tex.2006) (“[WJhere the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction.” (emphasis added) (internal quotation marks omitted)).
Accordingly, I would not accept Underwriters’ strategic attempt to waive the threshold issue of ambiguity. Because I would conclude, for the reasons set out below, that Exclusion J unambiguously applies to preclude coverage in this case, it is unnecessary to address the existence or scope of a sophisticated-insured exception to the contra proferentem rule.
II. Interpretation of Exclusion J
In my view, Exclusion J, which bars coverage for “any Wrongful Act occurring subsequent to ... [a]nother entity or individual holding] a majority of the voting rights in the Parent Company,” unambiguously applies under the facts of this case.
The “Wrongful Act[s]” at issue here all occurred after the district court, in a separate case, entered an order appointing a Receiver over Stanford and the primaiy covered entity at issue, SFGC.[3] Under that Receivership Order, the Receiver “t[ook] possession of’ all of Stanford’s assets and property, which necessarily included Stanford’s shares in SFGC. The Receivership Order thus had the effect, as a matter of both state and federal receivership law,[4] of granting the Receiver the right to vote the shares of SFGC.[5] SFGC is incorporated under the laws of Florida, and according to Florida law, “[sjhares held by or under the *637 control of a receiver ... may be voted by him or her without the transfer thereof into his or her name.” Fla. Stat. § 607.0721(7). And under the “historical practice in federal courts,” Fed. R. Civ. P. 66, a receiver’s “authority is wholly determined by the order of the appointing court.” Citibank, N.A. v. Nyland (CF8) Ltd., 839 F.2d 93, 98 (2d Cir.1988); see See. & Exch. Comm’n v. Safety Fin, Serv., Inc., 674 F.2d 368, 373 (5th Cir.1982). The Receivership Order, fairly read, grants the Receiver the authority to vote the SFGC shares by: (1) giving the Receiver possession and control of all “assets, monies, securities, properties ... and the legally recognized privileges” of SFGC; (2) authorizing the Receiver to “Maintain full control of the Receivership Estate;” (3) directing the Receiver to “[cjollect, marshal, and take custody, control, and possession of all ... assets of ... the Receivership Estate;” and (4) granting the Receiver the power to “[p]erform all acts necessary to conserve, hold, manage, and preserve the value of the Receivership Estate.” (emphasis added). Given the Receiver’s authority to vote Stanford’s shares in SFGC, the plain language of Exclusion J — which applies when “[a]nother entity or individual holds a majority of the voting rights in [SFGC]” — was triggered by the Receivership Order.
Exclusion J is not rendered ambiguous, as the district court reasoned, because the Receiver merely stood in Stanford’s shoes. Although a receiver “stands in the shoes of’ the entity or individual over which he maintains control, Fed. Deposit Ins. Corp. v. Wright (In re Still), 963 F.2d 75, 77 (5th Cir.1992), it is also clear that a receiver is “not an agent of the parties,” and is instead “considered to be an officer of the court,” 12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2981 (2d ed.2015). In any event, regardless of the exact nature of the relationship between Stanford and the Receiver, the Receiver (and the court, of which the Receiver is an officer) remains “[a]nother entity” from Stanford.
Finally, this result is consistent with the reasoning behind Exclusion J and other such “change in control” provisions: “While the insurer had an opportunity to evaluate the risk presented by the previous management, it does not necessarily have knowledge of the new management and does not wish to automatically extend coverage to the new management.” Carrie E. Cope, New Appleman Insurance Law Practice Guide § 37:10[4] (2012); see also John F. Olson, et al., Director & Officer Liability: Indemnification and Insurance § 12:41 (2014). The Receivership Order here granted the Receiver full management powers over SFGC, including the power to “retain or remove, as the Receiver deems necessary or advisable, any officer, director, independent contractor, employee, or agent of [SFGC].” In issuing the policies, the Underwriters had not bargained for risks relating to new management the Receiver may bring in — the very concern underlying these exclusions.[6]
* J}« ❖
*638 Accordingly, because Exclusion J unambiguously applies under the facts of this case, it is unnecessary to address the application of the contra proferentem rule. As I would reverse and render judgment in favor of Underwriters, I respectfully dissent.

. This appears to be one of the reasons why the evidence relating to the sophisticated-insured exception is so thin.

. Thankfully, the opinion is unpublished, and therefore non-precedential. But to take much comfort from that is to overlook the frequency with which unpublished opinions are cited in briefs and elsewhere.

. Although the Receivership Order does not explicitly name SFGC, it names Stanford himself as a defendant, authorizing the Receiver to "take and have complete and exclusive control, possession, and custody” of all assets and property "and the legally recognized privileges ... of the Defendants and all entities they own or control." (emphasis added). Thus, it is clear that, through the Receivership Order, the Receiver took possession and control of SFGC — an entity Stanford "own[ed] or controlled].”

. It is unclear which law applies. Compare 28 U.S.C. § 959(b) ("[A] ... receiver ... appointed in any cause pending in any court of the United States ... shall manage and operate the property in his possession as such ... receiver ... according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.”), and Jones v. Wells Fargo Bank, N.A., 666 F.3d 955, 966 n. 11 (5th Cir.2012) (per curiam) ("The rights of a receiver are determined by state law.” (citing 28 U.S.C. § 959(b)), with Fed. R. Civ. P. 66) (“[T]he practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule.”).

.The Receivership Order, which limits the grant of possession and control of "legally recognized privileges” to those "with regard to the entities,” does not implicitly except Stanford's right to vote his shares of SFGC. Such a construction of that provision, which likely refers only to Stanford’s personal rights, rather than his rights with respect to the entities at issue, would defeat the purpose of granting the Receiver the power to “[m]aintain' full control of’ those entities and to "[cjollect, marshal, and take custody, control and possession of” all assets under the control of those entities.

. Two other arguments raised by the district court merit only brief responses. First, the district court reasoned that the application of Exclusion J in this case is inconsistent with a separate provision in the policies "expressly contemplat[ing] that [the policies] would remain in force if a bankruptcy trustee were appointed for R. Allen Stanford.” But that provision merely defines Directors and Officers to include their estates in the event of bankruptcy. The two provisions do not conflict because even after the appointment of a receiver or bankruptcy trustee, the policies remain in effect with respect to "Wrongful Act[s]” committed prior to the appointment. Second, the district court suggested that Exclusion J may be void as an ipso facto clause contrary to public policy. Even if Exclusion J *638 could be considered an ipso facto clause, given that it arguably has the effect of modifying the insurance policies upon appointment of a receiver, it is not void as contrary.to public policy. In reaching the opposite conclusion, the district court relied on two inapposite statutes addressing ipso facto clauses in the bankruptcy and FDIC contexts. But there do not appear to be any statutes or cases indicating that Congress disfavors ipso facto clauses in the context of an SEC receiver. See Fid. & Deposit Co. of Md. v. Conner, 973 F.2d 1236, 1241 (5th Cir.1992) (“Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.” (internal quotation marks omitted)). Moreover, there do not appear to be any Texas cases — and neither the district court nor Appellees have cited any — disfavoring ipso facto clauses in any context.